1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROGER R. ADAMS,

11              Petitioner,              No. 2: 10-cv-2266 JAM KJN P

12        vs.

13   FRANCISCO JACQUEZ,

14              Respondent.             FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  In 2007, a jury convicted petitioner of two counts

19   of attempted murder (Cal. Penal Code §§ 664, 187), discharging a firearm from a vehicle (Cal.

20   Penal Code § 12034(c)) and shooting at an occupied vehicle (Cal. Penal Code § 246).  The jury

21   also found gang and firearm enhancements to be true.  (Cal. Penal Code §§ 186.22(b)(1),

22   12022.53(c), 12022.53(e)(1)).  Petitioner is serving a sentence of 60 years to life, plus 50 years.

23              This action is proceeding on the original petition filed August 19, 2010.

24   Petitioner raises the following claims: 1) insufficient evidence; 2) jury instruction error; 3) trial

25   court made errors in evidentiary rulings; 4) ineffective assistance of counsel; 5) violation of the

26   right to confront witnesses; and 6) prosecutorial misconduct.  After carefully considering the

1   record, the undersigned recommends that the petition be denied.[1]

2   II.   Standards for a Writ of Habeas Corpus

3              An application for a writ of habeas corpus by a person in custody under a

4   judgment of a state court can be granted only for violations of the Constitution or laws of the

5   United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

6   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

7   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

8              Federal habeas corpus relief is not available for any claim decided on the merits in

9   state court proceedings unless the state court's adjudication of the claim:

10            (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established Federal law, as
11            determined by the Supreme Court of the United States; or

12            (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
13            State court proceeding.

14   28 U.S.C. § 2254(d).

15             Under section 2254(d)(1), a state court decision is "contrary to" clearly

16   established United States Supreme Court precedents if it applies a rule that contradicts the

17   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

18   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

19   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

20   (2000)).

21             Under the  "unreasonable application" clause of section 2254(d)(1), a federal

22   habeas court may grant the writ if the state court identifies the correct governing legal principle

23   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

24

25            [1] On May 25, 2011, the undersigned recommended that the habeas petition filed by
      petitioner's co-defendant be denied.  See Trotter v. Lopez, 10-cv-0996 FCD KJN P (Dkt. No.
26   19).

prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at

1  786.

2  III.  <u>Factual Background</u>

3         Respondent's answer contains a factual summary.  In his reply to the answer,

4  petitioner states that he "agrees" with this summary.  (Dkt. No. 24 at 10.)   After independently

5  reviewing the record, the undersigned finds respondent's summary to be accurate.  Accordingly,

6  it is adopted below with some minor changes.

7         At approximately 10:30 p.m. on April 12, 2005, Rasheed Washington drove from

8  his grandmother's house to Elm Street, between Grand Avenue to the south and Harris Avenue to

9  the north, in the Del Paso Heights section of Sacramento to meet up with his cousin, Dellanthony

10  Bradford, and a friend, Ivory King.  ( Reporter's Transcript ("RT") at 90-95, 124, 146-47.)

11  When Washington arrived, he stopped his car in the middle of the street facing south toward

12  Grand Avenue, while Bradford's car was parked facing north toward Harris Avenue.  Bradford

13  came over to the driver's side of Washington's car to talk with him while King remained seated

14  in the passenger seat of Bradford's car listening to music.  (<u>Id.</u> at 97-98, 124-29, 149-50.)

15         Washington and Bradford had been talking in the street for about five minutes

16  when a dark-colored car with a white top drove by heading south toward Grand Avenue.  (<u>Id.</u> at

17  102-04, 129-31, 150-52, 259.)  Right after the car went past, Washington heard gunshots and saw

18  flames and a gun sticking out from the rear window on the passenger side of the car.  (<u>Id.</u> at 101-

19  05.)  Washington put his car in reverse and sped backward down the block, while Bradford ran

20  from the scene.  (<u>Id.</u> at 105-06.)  When it looked like the car was gone, Washington drove back

21  down the street and started looking for his cousin.  (<u>Id.</u> at 106.)

22         King, who had also heard the gunshots, leaned over the passenger seat, put

23  Bradford's car in gear, turned the steering wheel, and pressed the gas pedal with one of his hands

24  to get away.  (<u>Id.</u> at 128-32.)  After reaching the corner of Elm Street and Harris Avenue, King

25  moved over to the driver's seat, turned the car around and drove back to where the shooting had

26  occurred.  (<u>Id.</u> at 132-33.)

4

When Bradford heard the shots, he took off running through a field and then ran down an alley toward Harris Avenue. (Id. at 150, 153.)  As he was running, Bradford realized that he had been shot.  (Id. at 154.)  Within a couple of minutes, Bradford heard police sirens and saw police lights and he headed back to Elm Street holding his right hand, which had been hit by a bullet and was bleeding.  (Id. at 108-09, 130, 135, 154-58.)  Bradford laid down on the ground in the front yard of the house at 3813 Elm Street where brothers Brandon Boyer and Greg Speece lived.  (Id. at 109-10, 243, 249, 530-31.)

At that time, Office John Hosmer of the Sacramento Police Department was just around the corner in his police car in the parking lot of the Grant High School Police Department, located on the north side of Grand Avenue between Huron and Elm Streets and south of Harris Avenue.  (Id. at 164-65.)  Hosmer heard what sounded like five to ten gunshots in rapid succession coming from east of his location.  (Id. at 166, 169.)  Consequently, with all of the lights to his vehicle turned off, Hosmer pulled his patrol car to the front entrance of the parking lot where he had an unobstructed view to the east and west down Grand Avenue.  (Id. at 166.)

Within a matter of seconds of hearing the gunshots, Hosmer saw car headlights coming south down Elm Street toward Grand Avenue.  (Id. at 167.)  Hosmer observed the car turn westbound on Grand Avenue and then northbound on Huron Street.  (Id. at 167.)  At that point, Hosmer turned on the headlights for his car and started following the vehicle.  (Id. at 168.)  As Hosmer was trying to catch up to the car, it pulled over and parked in front of a residence at 3840 Huron Street.  Two black males wearing dark clothing (i.e., black, dark blue, or dark green) got out of the vehicle and walked to the south side of the home by the fence.  (Id. at 168, 171.)  One of the men appeared to have a long object in his hand.  (Id. at 170.)  After tossing the long object over the fence, both men climbed over the fence.  (Id. at 171.)

Hosmer reported, via radio, that the two men were fleeing eastbound from that location.  He then drove up Huron Street to Harris Avenue and proceeded into the alley between

Huron and Elm streets.  (Id. at 173.)  Hosmer shined his light down the alley and saw a black

male climbing over the back fence of the residence at 3841 Elm Street, knocking down a few

fence boards in the process.  This person "match[ed] somewhat" the description of the two men

Hosmer had seen in front of the residence at 3840 Huron Street.  (Id. at 173-74.)

In an effort to try and contain the two fleeing suspects as best he could until other

units arrived, Hosmer proceeded to the intersection of Elm Street and Harris Avenue and waited

to see if anyone "popped out onto the street at that point."  (Id. at 174, 177.)  Hosmer waited for

thirty to sixty seconds, but he did not see anyone appear.  (Id. at 176.)  He then went back and

shined his spotlight down the alley again for another thirty to sixty seconds, but Hosmer did not

see anyone.  However, when Hosmer returned to the intersection of Elm Street and Harris

Avenue, he saw petitioner squatting down on the sidewalk.  (Id. at 177-78.)  Hosmer asked

petitioner what he was doing, and petitioner told the officer he had just been shot at.  (Id. at 178.)

Hosmer then headed back to the alley for a third time.  This time because the

perimeter was set up and the area was contained, Hosmer got out of his vehicle and headed

southbound through the alley with his flashlight, looking in the backyards of the adjoining

homes.  (Id. at 179.)  In the yard at 3840 Huron Street where Hosmer had observed the two men

jump the fence and the one man toss a long object over the fence, he spotted a rifle in the

southwest corner of the yard.  (Id. at 179-80.)

Hosmer went into the yard and retrieved a .22 Lightning rifle along with a black

jacket that was on the ground about 10 feet away from the gun.  (Id. at 180, 272.)  Hosmer

checked to see if the rifle was loaded and found a live round in the chamber.  (Id. at 185.)  As

Hosmer was securing the weapon, the sheriff's helicopter, which was overhead at the time, asked

Hosmer over the radio if there were any plain clothes officers in the yard with him.  The officers

in the helicopter then told Hosmer that there was another person in the yard on the north side of a

shed.  (Id. at 185-86.)

Around that same time, Officer Randy Lozoya and his partner, Orland Morales,

responded to Hosmer's call and went to 3840 Huron Street where they found a late model white

and blue Chevrolet Caprice against a chain link fence.  (Id. at 260-61, 292.)  The car's engine

was still running.  (Id. at 262, 292.)  Lozoya and Morales rushed into the backyard through the

gate on the north side of the house and, along with Hosmer, they approached the shed in the yard.

The officers spotted co-defendant, who had been hanging onto the fence, sweating and seemingly

exhausted, and ordered him to get down on the ground, and then they arrested him.  (Id. at 185-

86, 262-63, 266-67, 292-94.)  Co-defendant's hands were covered in what appeared to be bodily

fluids, and, after he was taken to the patrol car, Morales saw co-defendant make physical

movements like he was vomiting on more than one occasion.  (Id. at 294-95.)  However, Hosmer

was not able to positively identify either petitioner or co-defendant as the two men who jumped

out of the car and hopped the fence into the backyard of the house at 3840 Huron Street.  (Id. at

187.)

When Lozoya was leaving the backyard through the gate, he saw a .38 snub nose

revolver laying on the grass to the north side of the driveway in the front yard.  (Id. at 266, 269.)

Lozoya examined the weapon and noticed that it contained four empty shell casings.  (Id. at 267-

68.)

Officer Keith Hoversten and his partner arrived on the scene within a minute and

took up a position on the perimeter of the area near the corner of Grand Avenue and Elm Street.

(Id. at 242.)  Almost immediately, a group of people flagged down the officers and told them that

someone (Bradford) had been shot and that the victim was at a house on Elm Street.  (Id. at 242.)

The officers then went to that location.  (Id. at 242-43.)  Hoversten asked Washington if he had

seen what happened and if he knew who had shot at them.  Washington told the officer that "he

figured it was probably the Nogales Crips because there had been a feud going on over the last

few months between Nogales and Elm Street."  (Id. at 246.)

Sergeant Pamela Seyffert also responded to Hosmer's call.  When she arrived at

the intersection of Elm Street and Harris Avenue, she encountered petitioner crouched down in a

1   lot of unkempt weeds or grass in the yard of the house on the southwest corner.  (Id. at 301-03,

2   585, 590-92.)  From the moment Seyffert first spotted petitioner in the light from her patrol car's

3   headlights, he looked "kind of shocked" and "nervous."  (Id. at 303.) Seyffert pulled over and

4   searched petitioner for weapons before placing him in the backseat of her patrol car, without

5   handcuffs, while she ran computer checks on the name he had provided to her.  (Id. at 302–04.)

6   While Seyffert was running those checks, she heard noises which sounded like petitioner "was

7   shuffling his feet around a lot" in the back passenger compartment.  (Id. at 304.)  Subsequently,

8   petitioner was moved to another police car, and Officer Tim McMahan transported him to the

9   Hall of Justice to be interviewed.  (Id. at 304-05, 331.)

10          Immediately after petitioner was transferred to McMahan's police vehicle,

11  Seyffert searched the back passenger compartment of her patrol car.  (Id. at 306.)  Seyffert found

12  what looked like a baby's sock shoved up between the Plexiglas and the steel cage at foot level.

13  (Id. at 308.)  Inside the sock, Seyffert found two .40 caliber Speer model bullets.  (Id. at 308-10.)

14          Later that night, Officer Mitchell Marquez found three expended shell casings in

15  the middle of Elm Street just south of the driveway to the home of 3813 Elm Street.  (Id. at 251.)

16  One of the casings was a .40 caliber casing manufactured by Speer.  (Id. at 255-56.)  The other

17  two were .22 caliber casings with the letter "C" stamped on them.  (Id. at 256-57.)  Marquez also

18  found a bullet hole in the trunk of Bradford's car.  (Id. at 157-59, 258.)  Additionally, during the

19  search of the backyards along the alley, the police also found a loaded Sig .40 caliber handgun

20  near the gate in the southeast corner of the yard at 3837 Elm Street, the house just to the south of

21  3841 Elm Street.  (Id. at 189-90.)

22          Tanya Atkinson, an identification technician for the Crime Scene Investigations

23  Unit, tested both petitioner and co-defendant for gunshot residue samples.  (Id. at 354-55.)  She

24  recalled that co-defendant had bodily fluid, which she believed was mucous, on his hands when

25  she tested him, and she did her best to "work around" the fluid.  (Id. at 356, 363.)

26          Kathleen Modeste, who worked in forensic identification for the police

8

department, lifted six fingerprints from the Chevrolet Caprice found in front of the house at 3840 Huron Street.  (Id. at 369-71.)  Modeste also tested the car for gunpowder residue, and she found a bullet casing on the left rear floorboard of the car.  (Id. at 371-74, 379-80.)

At the police station, investigators examined two cell phones that had been recovered at the scene.  (Id. at 338-48.)  One phone, a Samsung model, had been recovered from petitioner and was included in his property bag that had been taken to the station by McMahan.  (Id. at 274-75, 333, 340.)  While at the station, petitioner told police that the phone number for his cell phone was 912-7436.  (Id. at 340-41.)  The police checked the outgoing call log for this phone and found that a call had been made at 9:30 p.m. on April 12, 2005, to the number of 289-8391, which turned out to be co-defendant's cell phone number.  (Id. at 341, 343, 346, 498-99.)  Police also discovered that earlier the same evening, at 5:44 p.m., a text message had been sent to petitioner's phone which read, "What's up, Crip?"  (Id. at 346.)

Co-defendant's cell phone, a Nokia model, had been found in one of the pockets of the black jacket that Hosmer found by the .22 Lightning rifle in the backyard of 3840 Huron Street.  (Id. at 180, 272-73, 343.)  Police verified that the phone number for this cell phone was 289-8391, the same number noted in the call log for petitioner's cell phone at 9:30 p.m. on April 12, 2005.  (Id. at 347, 499.)  Not surprisingly, the incoming call log for this phone listed a call from petitioner's cell phone at 9:31 p.m. on April 12, 2005.  (Id. at 347-48.)  Additionally, the name listed on this cell phone was "RAH 1."  (Id. at 348.)

At trial, Edward Pollack, a criminalist with the Sacramento County Crime Laboratory, was qualified as an expert witness regarding the testing and analysis of gunshot residue.  (Id. at 397.)  Characteristic gunshot residue particles were found as follows: in multiple locations within the Chevrolet Caprice (i.e., the steering wheel, and all four doors) (id. at 416-21); on three separate areas of the black coat that was found in the backyard of the house at 3840 Huron Street (id. at 421-24); and, on a long-sleeved T-shirt and sweat shirt that were taken from petitioner.  (Id. at 275, 425-28.)

1    Except for one lead particle on the right palm and three lead particles on the left

2  back hand, no gunshot residue was found on the hands of petitioner's co-defendant.  (Id. at 415).

3  However, the criminalist testified that the lack of gunshot residue on someone's hands did not

4  preclude the possibility that someone fired a weapon or was near where a weapon was fired.  (Id.

5  at 415.)

6    Petitioner had one lead and antimony particle on the back of each hand.  (Id. at

7  415-16.)  The combination of lead and antimony could be associated with gunshot residue, but

8  there were other environmental sources that could account for the presence of that combination.

9  (Id. at 416.)   At the beginning of his testimony, the criminalist testified that petitioner had "zero

10  lead" on his hands.  (Id. at 415.)  However, later, the criminalist testified that petitioner also had

11  43 lead particles on the right back hand, 30 lead particles on the right palm, 23 lead particles on

12  the left back and 28 on the left palm.  (Id. at 416.)  The criminalist testified that the lead particles

13  could be caused by environmental sources other than handling a weapon.  (Id. at 416)  On cross-

14  examination, when asked "isn't it true that your result was there are no lead characteristic

15  gunshot residue particles containing lead, barium, and antimony on the samples collected from

16  the hands of [petitioner]," the criminalist answered, "yes, sir."  (Id. at 445.)

17    Michael Saggs, another criminalist with the Sacramento County Crime

18  Laboratory, was qualified as an expert witness regarding firearm and tool mark analysis.  (Id. at

19  470.)  Saggs determined that the bullet casing Modeste found on the left rear floorboard of the

20  Chevrolet Caprice was discharged in the .22 caliber Lightning rifle that Hosmer found in the

21  backyard at 3840 Huron Street.  (Id. at 475-79.)  Saggs also conclusively determined that one of

22  the expended .22 caliber shell casings found by Marquez in the middle of Elm Street was

23  discharged in the .22 caliber Lightning rifle.  (Id. at 256-57, 479-80.)  Regarding the other .22

24  caliber shell casing found by Marquez, Saggs was not able to make a conclusive identification.

25  However, the marks were "very suggestive that the cartridge case was discharged" by that gun,

26  and Saggs testified that the second expended .22 caliber casing from the street "was probably

1  discharged in the [.22 caliber lightning] rifle" found by Hosmer." (Id. at 483-84.)

2        Saggs also examined and tested the .40 caliber semiautomatic handgun that was

3  found near the gate in the southeast corner of the yard at 3837 Elm Street. (Id. 189-90, 480-82.)

4  Saggs compared a test round fired from that gun to the expended .40 caliber casing found by

5  Marquez in the middle of Elm Street. He concluded that the expended casing found by Marquez

6  had been discharged in the .40 caliber handgun found by police that night. (Id. at 481-82.)

7        In addition, Saggs examined the bullet that had been surgically removed from

8  Bradford's hand and determined that it was a .38 caliber bullet. (Id. at 157, 487-88.) When

9  asked if he could identify the manufacturer of the bullet, Saggs indicated that it was consistent

10  with some ammunition produced by Winchester, and he could not identify any other possible

11  manufacturers. (Id. at 489.) Saggs also noted that the ammunition inside of the .38 caliber snub

12  nose revolver found by Lozoya was produced by Winchester. (Id. at 266-69, 489-90.)

13        Adlert Robinson, a former 30 year veteran of the Sacramento Police Department

14  and a current investigator with the Sacramento County District Attorneys Office, who spent 11

15  years as a detective with the Sacramento Police Department's Gang Suppression Unit, was

16  qualified as an expert witness regarding gangs. (Id. at 500, 511.) According to Robinson, the

17  Bloods and the Crips are both criminal street gangs, composed primarily of African Americans

18  that started in the late 1970s or early 1980s in Southern California and that migrated to the

19  Sacramento area in the mid 1980s. (Id. at 511, 514.) As Robinson explained, Bloods and Crips

20  are really "umbrella groups" that consist of several smaller gangs that are usually divided by

21  neighborhoods, or even particular streets (i.e. Oak Park Bloods, Del Paso Heights Bloods,

22  Meadowview Bloods, Nogales Gangster Crips, 29th Street Crips, and Valley High Gangster

23  Crips). (Id. at 512-13.)

24        Regarding the Del Paso Heights Bloods, Robinson indicated that there are actually

25  even smaller groups (i.e., "a subset of a subset") of gang members, including a subset known as

26  the Elm Street Bloods. (Id. at 515-16.) Robinson estimated that there were approximately 30

1 validated members of the Elm Street Bloods in April 2005 and that the vast majority of those

2 gang members lived around the area of Elm Street and Grand Avenue.  (Id. at 516.)

3    Another gang, the Nogales Gangster Crips, controlled an area that was about a

4 quarter mile away from the "turf" occupied by the Elm Street Bloods.  (Id. at 516.)  In April

5 2005, there were 20 validated members of the Nogales Gangster Crips.  (Id. at 520.)  Per

6 Robinson, over the years, these two gangs would interact peacefully with each other for periods

7 of time, but occasionally, a conflict would arise between two gangs, which would then lead to a

8 "war" (i.e., acts of violence, including murder) between the gangs.  (Id. at 516-17, 521.)

9    For instance, on November 29, 2002, Jovan Jordan, a Nogales Gangster Crip,

10 pulled out a handgun and shot and killed two members of the Del Paso Heights Bloods after a

11 verbal altercation occurred at a pizza parlor.  (Id. at 522.)  As another example, in or around May

12 2000, three members of the Nogales Gangster Crips got into a fight at school with some members

13 of the Del Paso Heights or Elm Street Bloods.  A few days later, the Crips located a person who

14 was known to be in the company of Del Paso Heights or Elm Street Bloods but who was not a

15 validated gang member himself.  The Crips shot and killed this person while he was sitting in his

16 car.  (Id. at 523.)

17    In January 2005, another incident occurred which caused a "war" between the

18 gangs where "they were shooting back and forth at each other."  (Id. at 528-29.)  Specifically, a

19 member of the Nogales Gangster Crips known as Baby Rah Rah was shot and killed during an

20 alleged drug deal gone bad.  (Id. at 528.)  The word on the street was that the Elm Street Bloods

21 were responsible for Baby Rah Rah's death.  (Id. at 529-29.)  According to Robinson, because of

22 the gang culture, the Crips then needed to retaliate in order to avoid sending a message to other

23 gangs that they were weak and could be taken advantage of.  (Id. at 529-30.) Between January

24 2005 and April 2005, four known drive-by shootings occurred in the neighborhoods of Nogales

25 and Elm Street.  (Id. at 530.)

26    Robinson testified that Brandon Boyer and Greg Speece, who lived in the house at

3813 Elm Street where Bradford went after being shot, were both members of the Elm Street

Bloods.  (Id. at 530-31.)  He also indicated that petitioner had been a self-admitted member of the

Nogales Gangster Crips since 1991 and that another self-admitted member of that gang, Kenyatta

Hudson, named both petitioner and co-defendant as members of the Nogales Gangster Crips in

1993.  (Id. at 532-33.)  In addition to naming petitioner and co-defendant as gang members,

Hudson also told police their gang monikers: Hudson indicated that petitioner was known as Rah

Rah, and co-defendant was known as Mr. Magoo.  (Id. at 533, 536.)

       Robinson also testified about the gang tattoos on petitioner's body.  Specifically,

petitioner had the following tattoos: 1) the word "Nogales" was tattooed across his upper back; 2)

the word "Crips" was tattooed across his lower back; 3) a picture of a person with "Rah Rah"

below it was tattooed on his left arm; and 4) a picture of a person holding guns and a "rest in

peace" roll call list with the street monikers (i.e., "Big Happy," "Cig Head," and "Tiny Loc") and

dates of birth and death of former gang members who had died in the past.  The tattoo also had

an "NC" on it for Nogales Crips.  (Id. at 534-35.)

       Regarding co-defendant, both the Sacramento Police Department and the

California Statewide Law Enforcement Agency had him listed as a member of the Nogales

Gangster Crips, and both agencies knew his moniker was "Mr. Magoo."  (Id. at 536.)  As for

tattoos, co-defendant had the following markings: 1) the word "Nogales" was tattooed across his

chest; and 2) the letter "N" for Nogales on one arm and the letter "C" for "Crips" on the other

arm.  (Id. at 536-37.)

       In Robinson's expert opinion, the shooting in this matter was done for the benefit

of the Nogales Gangster Crips.  (Id. at 537.)  The fact that the shooting was a drive-by was a

significant factor in Robinson's determination.  The same is also true of the fact that the victims

were parked basically in front of the Boyer-Speece residence, which Robinson indicated was

"basically a secondary hang out for the Elm Street Bloods."  (Id. at 538.)  Robinson further

indicated the fact that the crime occurred in the heart of the Elm Street Bloods' territory

benefitted the Nogales Gangster Crips because it showed that the Crips were "not afraid to go

into another rival's neighborhood to take care of what they intend[ed] to do or try to find

someone or a target who they want to get.  It shows that they have no fear of Elm Street."  (Id. at

539.)

IV.  Discussion

       A.  Alleged Insufficient Evidence

       Petitioner alleges that there was insufficient evidence to support all of his

convictions.

       1.  Procedural Default

       In the answer, respondent argues that all of petitioner's claims alleging

insufficient evidence, but for the claim alleging insufficient evidence of the gang enhancement,

are procedurally barred.  Respondent argues that in denying petitioner's habeas corpus petition

raising these claims, the Sacramento County Superior Court found these claims barred pursuant

to In re Dixon, 41 Cal.3d 756 (1953) because they should have been raised on direct appeal.  (See

Respondent's Lodged Document 11, order by Superior Court.)  The Superior Court also cited In

re Lindley, 29 Cal.2d 709, 723 (1947), for the proposition that a claim alleging insufficient

evidence is not a proper issue for habeas review.  (Id.)

       The California Court of Appeal and California Supreme Court denied petitioner's

habeas petitions without comment or citation.  (Respondent's Lodged Documents 13, 15.)

Accordingly, the undersigned "looks through" these decisions to the last reasoned decision, i.e.

the Superior Court decision, to determine whether these claims are procedurally barred.  Ylst v.

Nunnemaker, 501 U.S. 797, 803 (1991).

       As a general rule, a federal habeas court "will not review a question of federal law

decided by a state court if the decision of that court rests on a state law ground that is

independent of the federal question and adequate to support the judgment."  Calderon v. United

States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson,

501 U.S. 722, 729 (1991)).  In order for a state procedural rule to be found independent, the state law basis for the decision must not be interwoven with federal law.  LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  To be deemed adequate, the rule must be well established and consistently applied.  Poland v. Stewart, 169 F.3d 575, 577 (9th Cir. 1999).  An exception to the general rule exists if the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.

Once the state has pleaded the existence of an independent and adequate state procedural ground as an affirmative defense, as respondent has in this case, the burden shifts to petitioner to place the adequacy of that procedural rule in issue.  Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).  In order to do so, petitioner must "assert[ ] specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."  Id. at 586.  Thereafter, the state retains the ultimate burden of proving adequacy of the asserted bar.  Id. at 585–86.

In the traverse, petitioner does not address the issue of the adequacy of the Dixon rule.  Instead, he argues he should be excused from the default because his appellate lawyer refused to raise the at-issue insufficient evidence claims on appeal.  (Dkt. No. 24 at 15.) Petitioner also suggests that as a "layman at the law," he did not know to raise these claims sooner.  (Id.)  Accordingly, the undersigned finds that petitioner has not met his burden of placing the adequacy of the Dixon rule at issue.  The claims are barred unless petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice if the claims are not reviewed.

Ineffective assistance of counsel will suffice to show cause if it was so ineffective as to violate the Federal Constitution.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000) (citing Murray v. Carrier, 477 U.S. 478, 486–88 (1986)).  Such a claim of ineffective assistance must be presented to the state courts as an independent claim, however, before it may be used to establish

1  cause for a procedural default.  Id. (citing Carrier, 477 U.S. at 489.)  In his habeas corpus petition

2  filed in the California Supreme Court, petitioner did not raise a claim alleging ineffective

3  assistance of appellate counsel.  (Respondent's Lodged Document 14.)  Accordingly, petitioner's

4  claim of alleged ineffective assistance of appellate counsel does not establish cause to excuse the

5  default of the insufficient evidence claims.

6          Petitioner's ignorance of the law also does not establish cause to excuse his

7  procedural default.  See, e.g., Hughes v. Idaho State Bd. of Corrections, 800 F.2d 905, 909 (9th

8  Cir. 1986) (fact that a petitioner was illiterate and lacked any legal assistance did not establish

9  cause to excuse a procedural default).

10         Because, as will be discussed herein, petitioner's claims have no merit, the

11  undersigned finds that petitioner has not demonstrated that the court's failure to consider these

12  claims will result in a fundamental miscarriage of justice.  Accordingly, all of petitioner's claims

13  alleging insufficient evidence, but for the claim alleging insufficient evidence of the gang

14  enhancement, are procedurally barred.

15         2.  Merits

16         In the alternative, the undersigned finds that petitioner's claims alleging

17  insufficient evidence are without merit.

18         *Legal Standard*

19         When a challenge is brought alleging insufficient evidence, federal habeas corpus

20  relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

21  most favorable to the prosecution, no rational trier of fact could have found "the essential

22  elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

23  319 (1979).  Jackson established a two-step inquiry for considering a challenge to a conviction

24  based on sufficiency of the evidence.  U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en

25  banc).  First, the court considers the evidence at trial in the light most favorable to the

26  prosecution.  Id.,citing Jackson, 443 U.S. at 319.  "'[W]hen faced with a record of historical facts

16

that supports conflicting inferences," a reviewing court 'must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id., quoting Jackson, 443 U.S. at 319. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

*Analysis: Attempted Murder, Shooting at Occupied Vehicle, Shooting from Vehicle, Gun Enhancement*

The undersigned first considers petitioner's claim that there was insufficient evidence to support his underlying convictions and the gun enhancement because there was no evidence identifying him as the shooter or as an occupant of the vehicle. (Dkt. No. 1 at 4, 29-43.) In support of this claim, petitioner also argues that there were no weapons found on his person and no evidence establishing that he discharged a firearm. (Id. at 4, 30-43.) Petitioner also argues that his fingerprints were not found in the vehicle. (Id. at 5.) Additionally, petitioner argues that his mere presence at the crime scene was insufficient evidence that he committed or aided and abetted the commission of the offenses. (Id. at 21-29, 44-48.)

The undersigned begins by setting forth the elements of petitioner's convictions. Attempted murder requires 1) the specific intent to kill; and 2) the commission of a direct but ineffectual act toward accomplishing the intended killing. People v. Smith, 37 Cal.4th 733, 739 (2005). Shooting from a motor vehicle requires a willful and malicious discharge of a firearm from a motor vehicle at a person other than the occupant. Cal. Penal Code § 12034(c). Shooting at an occupied motor vehicle requires a willful and malicious discharge of a firearm at an

occupied motor vehicle.  Cal. Penal Code § 965.

With regard to both counts of attempted murder, petitioner was also convicted of a firearm enhancement pursuant to Cal. Penal Code § 12022.53(c) which provides for a sentence enhancement of 20 years for any person who, "in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm."

With regard to the underlying convictions, petitioner was prosecuted as a principal and as an aider and abettor.  "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime."  People v. Cooper, 53 Cal.3d 1158, 1164 (1991).

Petitioner argues that there was insufficient evidence to convict him as an aider and abettor.  However, because the jury found petitioner guilty of personally discharging a firearm in connection with both counts of attempted murder, the jury did not convict petitioner as an aider and abettor, but as a principal of these crimes.  (CT at 312, 314.)  This finding also undermines any claim by petitioner that the jury found him guilty as an aider and abettor as to his convictions for shooting from a motor vehicle or shooting at an occupied motor vehicle.  By finding that petitioner personally used a firearm in connection with the attempted murder charges, the jury necessarily found that petitioner personally used a firearm in connection with the other charges.

Viewing the evidence in the light most favorable to the prosecution, the undersigned finds that the evidence was adequate to allow a rational trier of fact to find petitioner guilty as a principal of all charges as well as the firearm enhancement.  Petitioner and his co-defendant were found very close to the scene of the shooting under circumstances suggesting that they were attempting to flee the area.  Petitioner attempted to hide a sock containing two .40 caliber Speer bullets by stuffing it between the Plexiglass and steel cage of a patrol car.  One of

18

1  the casings found at the scene of the shooting was a .40 caliber casing manufactured by Speer.

2  During the search of the backyards in the area, an officer found a loaded Sig .40 caliber handgun.

3        While gunpowder residue was not found on petitioner's hands, the criminalist

4  testified that this did not necessarily mean that he had not fired a weapon.  Gunshot residue was

5  found on a long-sleeved t-shirt and sweatshirt taken from petitioner.  Gunshot residue was also

6  found in the Chevrolet Caprice.

7        Additionally, strong evidence of petitioner's motive was presented, i.e. that the

8  shooting was gang related.  Evidence was presented that both petitioner and his co-defendant

9  were members of the Nogales Gangster Crips.  Evidence was also presented that the Nogales

10  Gangster Crips were in a war with the Elm Street Bloods, and that the shooting occurred in front

11  of  a hang out for the Elm Street Bloods.

12        In conclusion, the undersigned finds that, viewing the evidence in the light most

13  favorable to the prosecution, a reasonable trier of fact could find petitioner guilty of the

14  underlying offenses as well as the gun enhancement.  While no witness saw petitioner shoot any

15  gun from the vehicle, there was adequate circumstantial evidence from which a reasonable jury

16  could conclude that petitioner fired shots at the victims from the car with the intent to kill.

17  Accordingly, this claim of insufficient evidence should be denied.

18        *Analysis: Gang Enhancement*

19        The undersigned next considers whether there was sufficient evidence to support

20  petitioner's conviction for the gang enhancement.

21        Petitioner argues that there was insufficient evidence to support the gang

22  enhancement on four different grounds.  (Dkt. 1 at 75-89, 95-103, 107-17.)  In particular,

23  petitioner argues that there was insufficient evidence that the Nogales Gangster Crips had as one

24  of its primary activities the offenses he committed.  Second, petitioner argues that there was

25  insufficient evidence that the shooting was committed for the benefit of, at the direction of, or in

26  association with the gang.  Third, petitioner argues that there was insufficient evidence that he

19

intended to promote, further or assist in any criminal conduct by gang members.  Fourth, he

argues that there was insufficient evidence that he was an active participant in the gang.

Petitioner raised the first three claims on direct appeal.  In a reasoned opinion, the

California Court of Appeal addressed these claims:

> Section 186.22, subdivision (b)(1) provides for an enhanced prison sentence when a defendant commits a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members[.]" For purposes of this statute, a "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [specified criminal activities], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

> Defendants assert there is insufficient evidence to establish certain of these elements. Specifically, they contend that there was no substantial evidence that the Nogales Gangster Crips had as "one of its primary activities" the commission of the requisite offenses. They also assert that there was no substantial evidence that the shooting was committed "for the benefit of, at the direction of, or in association with" the Nogales Gangster Crips, or that it was intended "to promote, further, or assist in any criminal conduct by gang members." None of these claims has merit.

> "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]

> "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the ... jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (People v. Jones (1990) 51 Cal.3d 294, 314.)

> Defendants assert that there was insufficient evidence to establish that the Nogales Gangster Crips had one of the specified criminal acts as one of its "primary activities" and therefore the gang

20

enhancements cannot stand. We disagree.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (People v. Sengpadychith (2001) 26 Cal.4th 316, 323.)

Defendants contend that the only evidence relied upon by the prosecutor to establish primary activities was the description of two murders that occurred in 2002 and 2004. That is not the case. In addition to describing those acts, the gang expert also testified that the Nogales Gangster Crips and Elm Street Bloods had been involved in a war between January 2005 and April 2005, when this shooting occurred. This feud was sparked by the homicide of a Nogales Gangster Crips member and led to four drive-by shootings in a four-month period in this neighborhood. This evidence was sufficient to meet the "primary activity" requirement.

Defendants next contend that there was insufficient evidence to establish that the shooting was done "for the benefit of, at the direction of, or in association with any criminal street gang." However, as defendants also recognize, courts have held otherwise in the identical circumstances.

"The crucial element ... requires that the crime be committed (1) for the benefit of, (2) at the direction of, or (3) in association with a gang. Thus, the typical close case is one in which one gang member, acting alone, commits a crime. Admittedly, it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang. Here, however, there was no evidence of this. Thus, the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." (People v. Morales (2003) 112 Cal.App.4th 1176, 1198; see also People v. Leon (2008) 161 Cal.App.4th 149, 163; People v. Martinez (2008) 158 Cal.App.4th 1324, 1332.)

We agree with that analysis. Here, defendants were both known members of the Nogales Gangster Crips and committed the drive-by shooting together, firing their weapons in front of a house known as the "secondary hang out for the Elm Street Bloods." Given the setting and the recent spate of shootings in this area, the jury could reasonably conclude that defendants acted in association with a criminal street gang. Defendants' claims to the contrary are not persuasive.

Finally, defendants contend that there was insufficient evidence to demonstrate that they intended "to promote, further, or assist in any criminal conduct by gang members." To the contrary. The gang

expert testified that the Nogales Gangster Crips and Elm Street Bloods were feuding in this neighborhood; four other drive-by shootings had occurred in the preceding months. Defendants, known members of the Nogales Gangster Crips, committed this drive-by shooting in front of the house of a known member of the Elm Street Bloods. The gang expert testified that such a shooting, in the heart of enemy territory, was designed to demonstrate that the Nogales Gangster Crips were "not afraid to go into another rival's neighborhood to take care of what they intend[ed] to do or try to find someone or a target who they want to get. It shows that they have no fear of Elm Street."

There was ample evidence to support the jury's determination that defendants had the requisite intent to support the gang enhancement allegations.

(Respondent's Lodged Document 6, at 8-12.)

For the reasons stated by the California Court of Appeal, the undersigned finds that petitioner's first three claims alleging insufficient evidence to support his conviction for the gang enhancement are without merit.

The undersigned first addresses petitioner's claim that there was insufficient evidence that the Nogales Gangster Crips had homicide as a primary activity. "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," as opposed to the "occasional commission of those crimes by [one or more of] the group's members." People v. Sengpadychith, 26 Cal.4th at 316, 323 (2001).

Proof of the primary activities element may be accomplished through expert testimony. Sengpadychith, 26 Cal.4th at 324. "The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities. [Citations.]" People v. Duran, 97 Cal.App.4th 1448, 1465 (2002).

In the instant case, the prosecution offered the testimony of expert witness Adlert Robinson to prove that homicide was a primary activity of the Nogales Gangster Crips.

Petitioner argues that Robinson did not provide adequate evidentiary foundation for his opinion that shootings and homicides were primary activities of the Nogales Gangster Crips. (Dkt. 1, at 86.) Accordingly, the undersigned herein summarizes Robinson's testimony relevant to this claim.

Adlert Robinson, testified that he had been working in the Del Paso Heights area for 20 years. (RT at 509.) He worked with the gang suppression unit for the past 11 years. (Id. at 500.) He went to 40 hours of training for gang investigations. (Id. at 500.) Based on his personal experience, he testified that the Nogales Gangster Crips and Elm Street Bloods had been able to interact for periods of time, but then a conflict will break out and a "war" between the two gangs occurs. (Id. at 516.) He testified that in both gangs, younger members join and in order to earn their reputation, they will be "put in work," i.e., directed to go out and commit crimes. (Id. at 517.) These crimes include holding dope, holding guns, assisting in drive-by shootings, or hiding "home boys" who commit crimes. (Id. at 518.)

He testified that the Nogales Gangster Crips had homicide, including murder, as a primary activity. (Id. at 521.) Robinson testified that he knew that homicide was a primary activity of this gang because he had investigated some of these crimes. (Id. at 522.) Robinson testified regarding a murder committed by a Nogales Gangster Crip in 2002 and another committed in 2000.[2] (Id.) In the 2002 murder, a Nogales Gangster Crip shot and killed two DPH Blood gang members following a verbal confrontation. (Id.) In 2000, three Nogales Gangster Crips members were assaulted by either DPH Bloods or Elm Street Bloods. (Id.) A few days later, these Nogales Gangster Crips found a person who was known to be an associate of either the DPH Bloods and Elm Street bloods and killed him. (Id. at 523.)

Robinson also testified that at the time of petitioner's crimes, a "war" had been

---

[2] The California Court of Appeal states that the prior murders occurred in 2002 and 2004. The reporter's transcript indicates that these prior murders occurred in 2000 and 2002. (RT at 522, 523.)

1  going on between the Nogales Gangster Crips and the Elm Street Bloods.  (Id. at 528.)  The war

2  involved "shootings, drive-by shootings.  They were shooting back and forth at each other."  (Id.)

3  Between January and April 2005 there were four drive-by shootings in the "turfs" of the Elm

4  Street Bloods and Nogales Gangster Crips.  (Id. at 530.)

5  In People v. Martinez, 158 Cal.App.4th 1324, 1330 (2008), the California Court

6  of Appeal found the gang expert's testimony to have adequate foundation:  "In [Martinez], on the

7  other hand, [the gang expert] had both training and experience as a gang expert.  He specifically

8  testified as to [the gang's] primary activity.  His eight years dealing with the gang, including

9  investigations and personal conversations with members, and reviews of reports suffices to

10  establish the foundation for his testimony. [Citation.]"

11  In the instant case, Adlert Robinson's opinion regarding the gang's primary

12  activity was based on his training as well as his years of investigating crimes involving the

13  Nogales Gangster Crips.  Based on this experience, his opinion that the Nogales Gangster Crips

14  had homicide as one of their primary activities had an adequate foundational basis.

15  Petitioner further argues that Robinson testified to only two prior murders

16  involving Nogales Gangster Crips, which petitioner suggests were not committed on behalf of

17  the gang.  However, Robinson's testimony indicates that these were just two murders he

18  investigated:

19  Q: This particular group, the Nogales Gangster Crips, did they
20  have as their primary or some of their primary activities shootings?

21  A: Yes.

22  Q: And homicide?

23  A: Yes.

24  Q: Including murder?

25  A: Yes.

26  Q: How do you know that?

1    A: Because I investigated some of those cases.

2    Q: All right.  You're also aware of some Nogales Gangster Crips
     who committed homicides, who were arrested and prosecuted right
3    here in Sacramento County?

4    A: Yes.

5    Q: And I want to ask you about two of those in particular....

6    (RT at 521-22.)

7              Robinson's testimony indicates that he had investigated more homicides

8    committed by Nogales Gangster Crips than just the two he testified to in detail.  In addition, he

9    also testified that at the time of petitioner's crimes, the Nogales Gangster Crips and Elm Street

10   Bloods had been shooting back and forth at each other.  After reviewing Robinson's entire

11   testimony, the undersigned finds that the foundation of his opinion regarding the primary activity

12   of the gang was adequately established.  Based on Robinson's testimony, it would not be

13   unreasonable for a jury to conclude that the Nogales Gangster Crips had homicide as a primary

14   activity.

15             In a section of his petition addressing prosecutorial misconduct, petitioner argues

16   that there was insufficient evidence that the shooting was done for the benefit of the gang.  In

17   particular, petitioner argues that the prosecutor failed to present sufficient evidence that the

18   shootings were in retaliation for Little Rah Rah's murder.  (Dkt. 1, at 146.)  In support of this

19   claim, petitioner contends that Robinson's testimony that the "word on the street" was that the

20   Bloods shot Little Rah Rah did not have adequate foundation.   (Id. at 146-50.)

21             Robinson testified that in January 2005, Baby Rah Rah, a member of the Nogales

22   Gangster Crips, was killed.  (RT at 529.)  After this murder, a "war" broke out between the

23   Nogales Gangster Crips and the Elm Street Bloods, which included drive-by shootings.  (Id. 528-

24   29.)  In April 2005, petitioner and his co-defendant shot at two people who were in front of a

25   house that was known as a Crips hang out.  (Id. at 538.)  Both petitioner and his co-defendant

26   were known members of the Nogales Gangster Crips.  From this evidence, a reasonable jury

could infer that the shooting was committed for the benefit of the gang rather than as a "frolic" by petitioner and his co-defendant.  <u>People v. Abillar</u>, 244 P.2d 1062, 1072 (2010).  Therefore, even assuming that Robinson's testimony regarding the "word on the street" did not have adequate foundation, there was sufficient additional evidence to support the jury's finding that the shooting was done for the benefit of the gang.

Petitioner next argues that there was insufficient evidence that the crimes were committed to "promote, further or assist in any criminal conduct by gang members."  This element of the enhancement was recently clarified.  To sustain a conviction under California Penal Code § 186.22, there must be sufficient evidence that the defendant had the specific intent to promote, further or assist in some type of criminal gang conduct, *which may include the crimes of conviction*.  <u>Emery v. Clark</u>, 2011 WL 2090827, at *4 (9th Cir. May 27, 2011), citing <u>People v. Albillar</u>, 244 P.2d 1062, 1075  (2010).

Sufficient evidence supported petitioner's conviction based on this recently clarified standard.  Again, the evidence demonstrated that petitioner and his co-defendant committed the shootings in furtherance of the war with the Elm Street Bloods.  Based on this evidence, it would not be unreasonable for a jury to conclude that the shootings were intended to assist in criminal conduct (murder) by known gang members (petitioner and his co-defendant) within the meaning of California Penal Code § 186.22(b).

In his direct appeal, petitioner did not argue that there was insufficient evidence that he was an active participant in the gang.  It is unclear whether this claim is exhausted.  Nevertheless, this claim may be addressed because it is without merit.  28 U.S.C. § 2254(b)(2) (claim may be de denied on merits notwithstanding the failure of applicant to exhaust state court remedies).

California Penal Code section 186.22(b) does not require "active" or "current" active" participation in a gang.  <u>In re Ramon T.</u>, 57 Cal.App4th 201, 207 (1997) (Cal. Penal Code section 186.22(a) requires active participation in a gang; no such requirement is found in section

186.22(b).)  Accordingly, this claim is without merit.

*Conclusion*

After conducting a review of petitioner's claims pursuant to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") as set forth at 28 U.S.C. § 2254(d), the undersigned recommends that petitioner's claims alleging insufficient evidence be denied.

B. Alleged Evidentiary Ruling Errors

Petitioner makes the following claims challenging evidentiary rulings by the state court: 1) the trial court erred in denying his motion to bifurcate the gang expert's testimony (Dkt. No. 1 at 4); 2) the trial court erred in admitting evidence of his tattoo (id. at 62, 117); 3) the trial court erred in admitting Washington's opinion that the crime was gang related  (id. at 62, 124); 4) the gang expert's testimony should have been subject to the Kelly-Frye rule  (id. at 67); and 5) the trial court erred in allowing the gang expert to testify regarding petitioner's gang membership because it constituted inadmissible propensity evidence  (id. at 104) .

*Legal Standard*

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be used to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

The Supreme Court has reiterated the standards of review for a federal habeas court.  Estelle v. McGuire, 502 U.S. 62 (1991).  In Estelle v. McGuire, the Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the evidence was incorrectly admitted under state law since, "it is not the province of a federal habeas court to

1    reexamine state court determinations on state law questions." Id. at 67-68. The Court re-

2    emphasized that "federal habeas corpus relief does not lie for error in state law." Id. at 67, citing

3    Lewis v. Jeffers, 497 U.S. 764 (1990), and Pulley v. Harris, 465 U.S. 37, 41 (1984) (federal

4    courts may not grant habeas relief where the sole ground presented involves a perceived error of

5    state law, unless such error is so egregious as to amount to a violation of the Due Process or

6    Equal Protection clauses of the Fourteenth Amendment).

7            The Supreme Court further noted that the standard of review for a federal habeas

8    court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

9    the United States (citations omitted)." Id. at 68. The Court also stated that in order for error in

10   the state trial proceedings to reach the level of a due process violation, the error had to be one

11   involving "fundamental fairness," Id. at 73, and that "we 'have defined the category of

12   infractions that violate "fundamental fairness" very narrowly.'" Id. at 73. Habeas review does

13   not lie in a claim that the state court erroneously allowed or excluded particular evidence

14   according to state evidentiary rules. Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

15           *Bifurcate*

16           Petitioner argues that the trial court erred in denying his motion to bifurcate the

17   gang expert's testimony. Because petitioner uses the word "bifurcate," it appears that petitioner

18   means to argue that the trial court erred in denying his motion to bifurcate the gang enhancement.

19   Although petitioner's lawyer made a motion to exclude evidence of the gang expert's testimony

20   (Court Reporter's Transcript ("CT") at 232), the undersigned can find no record of a motion to

21   bifurcate the gang enhancement.

22           To the extent petitioner argues that the trial court violated state law in failing to

23   bifurcate the gang enhancement, his claim fails. To the extent petitioner alleges a violation of the

24   United States Constitution, the United States Supreme Court has not held that such bifurcation is

25   constitutionally mandated. In Spencer v. Textas, 385 U.S. 554, 565-66 (1967), the Supreme

26   Court stated that "[t]wo-part jury trials are rare in our jurisprudence" and "have never been

1    compelled by this Court as a matter of constitutional law."  Accordingly, no clearly established

2    Supreme Court authority supports petitioner's challenge to the trial court's alleged refusal to

3    bifurcate.

4            In any event, the alleged denial of petitioner's request to bifurcate did not violate

5    fundamental fairness.  In California, a trial court has discretion to bifurcate the trial of a criminal

6    street gang enhancement allegation.  People v. Hernandez, 33 Cal.4th 1040, 1049–51 (2004).

7    Bifurcation is unnecessary, however, where the evidence supporting the gang enhancement

8    allegation would be admissible at a trial on the issue of guilt.  Id. at 1049–50.  Moreover, even if

9    some of the evidence offered to prove the enhancement allegation would be inadmissible at a

10   separate trial on the issue of guilt, a court may deny bifurcation where additional factors favor a

11   unitary trial.  Id. at 1050.  The defendant bears the burden "to clearly establish that there is a

12   substantial danger of prejudice requiring that the charges be separately tried."  Id. at 1050–51.

13           In the instant case, evidence supporting petitioner's gang enhancement was

14   admissible in the guilt phase to prove the specific intent required for attempted murder as well as

15   motive.  For these reasons, the trial court's alleged denial of petitioner's request to bifurcate the

16   gang enhancement did not violate fundamental fairness.

17           *Kelly-Frye*

18           Petitioner argues that the gang expert's testimony constituted scientific evidence

19   and should have been subject to the Kelly-Frye standard for new scientific evidence.  Within this

20   claim, petitioner also argues that the gang expert's testimony was inflammatory and prejudicial.

21           In People v. Kelly, 17 Cal.3d 24, 30–32 (1976), the California Supreme Court

22   reaffirmed that, in California, the test for admissibility of expert testimony based on the

23   application of a new scientific technique comported with what was then the federal test, as set

24   out in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir. 1923).

25           The Frye test has been superseded as to admissibility of scientific evidence in

26   federal courts by the test announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.

579, 594–95 (1993).  Prior to <u>Daubert</u>, California courts referred to the test as the <u>Kelly/Frye</u> test.
It now is referred to simply as the <u>Kelly</u> test or rule.  <u>See</u>, <u>e.g.</u>, <u>People v. Bolden</u>, 29 Cal.4th 515,
545 (2002).

      Because this is a federal habeas case, this court does not determine whether the
expert's testimony was properly admitted under state law, <u>Ainsworth v. Calderon</u>, 138 F.3d 787,
796, amended, 152 F.3d 1223 (9th Cir.1998), and does not consider whether the evidence passes
muster under the Federal Rules of Evidence or <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,
509 U.S. 579 (1993), which was not decided on constitutional grounds.

      Admission of the gang expert testimony did not render petitioner's trial so
fundamentally unfair as to violate due process.  <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1192 (9th Cir.
1993) (habeas relief available for wrongly admitted evidence only when it renders the trial
fundamentally unfair).  The expert gang testimony was relevant to petitioner's intent and motive
for the attempted murder charges.  Accordingly, petitioner's claim challenging admission of the
expert gang evidence on grounds that it was inflammatory and prejudicial is without merit.

*Propensity*

      Petitioner argues that the gang expert testimony was inadmissible because it
improperly showed his propensity to commit the crimes.  This claim is without merit because the
United States Supreme Court has not held that the introduction of prior bad act evidence to show
propensity to commit the current crime violates due process.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S.
62, 75 (1991) ("we express no opinion on whether a state law would violate the Due Process
Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged
crime").  Accordingly, petitioner is not entitled to habeas relief as to this claim.  <u>See</u> <u>Moses v.
Payne</u>, 555 F.3d 742, 758-59 (9th Cir. 2009) (habeas relief unavailable where the Supreme Court
has articulated no "controlling legal standard" on the issue).

*Washington's Statement*

      Petitioner argues that the trial court violated his right to due process by admitting

1   Washington's statement that the shooting was gang-related and committed by the Nogales

2   Gangster Crips.  The California Court of Appeal denied this claim for the reasons stated herein:

3           At trial, Officer Hoversten testified that on the night of the
            shooting, he had asked one of the victims, R.W., if he knew who
4           had fired the shots. He said that R.W. replied that "it was probably
            the Nogales Crips because there had been a feud going on over the
5           last few months between Nogales and Elm Street." The trial court
            instructed the jury that this statement was not offered for the truth
6           of the matter asserted, but was admissible solely to help determine
            credibility issues.
7
            Defendants contend that R.W.'s statement should have been
8           excluded as irrelevant, speculative and lacking foundation. Even if
            we were to agree with these claims, defendants cannot demonstrate
9           prejudice.

10          We presume that the jury followed the court's instructions and did
            not use R.W.'s statement in determining whether the shooting was
11          gang related. (People v. Smith (2007) 40 Cal.4th 483, 517.)
            Moreover, the prosecution's gang expert testified at length about
12          the ongoing war between the Nogales Gangster Crips and Elm
            Street Bloods that had already resulted in four drive-by shootings
13          in the same neighborhood in the preceding four months. Given this
            evidence, any error in admitting R.W.'s statement to Officer
14          Hoversten was harmless.

15  (Respondent's Lodged Document 6, at 6-7.)

16          The United States Supreme Court "has not yet made a clear ruling that admission

17  of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to

18  warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

19  Absent such a ruling from the Supreme Court, a federal habeas court cannot find the state court's

20  ruling was an "unreasonable application" of "clearly established federal law" under 28 U.S.C. §

21  2254(d)(1).  Id. (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)).

22          Because petitioner argues that Washington's statements were irrelevant and

23  prejudicial, his challenge to admission of this evidence must be rejected as there is no clearly

24  established Supreme Court authority in support of this claim.  See Holley, 568 F.3d at 1101 n.2

25  (finding that, although trial court's admission of irrelevant and prejudicial evidence violated due

26  process under Ninth Circuit precedent, such admission was not contrary to, or an unreasonable

                                                    31

1  application of, "clearly established Federal law" under section 2254(d)(1), and therefore not

2  grounds for granting federal habeas relief).

3         Even if <u>Holley</u> did not supply the rule for this claim, the undersigned would find,

4  for the reasons stated by the California Court of Appeal, that admission of  Washington's

5  statements did not violate fundamental fairness.  There was other evidence presented suggesting

6  that the shooting was gang related.  In addition, the jury is presumed to have followed the

7  instruction not to use Washington's statement in determining whether the shooting was gang

8  related.  <u>See</u> <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987) (juries are presumed to follow their

9  instructions).  The admission of Washington's statements regarding his belief as to why the

10  shootings occurred through the testimony of Officer Hoversten did not violate due process.

11         After conducting an AEDPA review, the undersigned recommends that this claim

12  be denied.

13         *Tattoo*

14         Petitioner argues that the trial court violated his right to due process by admitting

15  a photograph of one of his tattoos.  The California Court of Appeal denied this claim for the

16  reasons stated herein:

17            Defendants contend that the trial court erred in admitting a
              photograph of one of defendant Adams's tattoos because its
18            prejudicial effect outweighed any probative value. We disagree.

19            The tattoo in question is located on defendant Adams's arm. It
              depicts a man, wearing a shirt marked "NC" and holding up a
20            semiautomatic firearm; shell casings are coming out of the firearm.

21            Defendants sought to exclude the photograph of this tattoo
              because, according to defendants, it associated defendants with
22            random violence and was overly prejudicial. The trial court
              rejected these concerns, ruling the tattoo was not "so inflammatory
23            or over the top when considered with the rest of the tattoos that Mr.
              Adams has." The court ruled that the tattoo was relevant on the
24            issues of intent, motive, and identity, and that its probative value
              outweighed any prejudicial effect.

25
              Defendants contend that this ruling was erroneous because the
26            photograph evoked "horror and revulsion," and should have been

1    excluded. We disagree.

2    Evidence of gang tattoos is admissible if its probative value
     outweighs any potential for prejudice. (E.g., People v. Monterroso
3    (2004) 34 Cal.4th 743, 773; People v. Ochoa (2001) 26 Cal.4th
     398, 437-438.)

4
     The trial court here noted that this tattoo was "a message
5    [defendant Adams] intended to send," and was highly probative on
     the issues of intent, motive and identity. Moreover, given that
6    defendants sported other gang-related tattoos, this particular tattoo
     was not "over the top." The trial court concluded that the probative
7    value of this particular photograph outweighed any potential for
     prejudice. That determination was well within its discretion. There
8    was no error.

9    (Respondent's Lodged Document 6, at 7-8.)

10          Because petitioner argues that admission of the photograph was prejudicial, this

11   claim must be denied pursuant to Holley, supra.  Even if Holley were not applicable, the

12   undersigned would find that admission of the photograph did not violate fundamental fairness.

13   As noted by the California Court of Appeal, because petitioner had other gang-related tattoos,

14   this particular tattoo was not "over the top."

15          After conducting an AEDPA review, the undersigned recommends that this claim

16   be denied.

17                  C.  Alleged Jury Instruction Error

18          Petitioner alleges that the trial court erred by failing to define "materially" in the

19   jury instructions.  (Dkt. No. 1 at 6, 14-20.)  Petitioner also alleges that the trial erred by denying

20   his request to give instructions regarding lesser related offenses.  (Id., at 1, 49-59)  Petitioner also

21   alleges that the trial court did not adequately instruct the jury regarding the gang enhancement.

22   (Id., at 61, 90.)

23                  Legal Standard

24          A challenge to jury instructions does not generally state a federal constitutional

25   claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

26   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

                                          33

interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62 (1981); see also

Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

(9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

Estelle v. McGuire, 502 U.S. at 68.  In order for error in the state trial proceedings to reach the

level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at

73.  The Supreme Court has defined the category of infractions that violate fundamental fairness

very narrowly.  Id. at 73.

Where what is at issue is the failure to give an instruction, petitioner's burden is

"especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

155 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

Failure to give a jury instruction under these circumstances will not amount to a due process

violation.  Id.

The burden upon petitioner is greater yet in a situation where he claims that the

trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

Circuit has flatly held in non-capital cases that the failure to give the instruction states no federal

claim whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to

violate due process, the impact on the proceeding from failure to give an instruction sua sponte

must be of a very substantial magnitude.

Furthermore, the Supreme Court has held that there is no unreasonable application

of federal law where a state appellate court decided that a jury instruction's single incorrect

statement of the "imperfect self-defense" standard did not render the instruction reasonably likely

1   to have misled the jury.  <u>Middleton v. McNeil</u>, 541 U.S. 433 (2004).

2      *"Materially"*

3      Petitioner argues that Officer Seyffert gave false testimony at his trial.   Petitioner

4   appears to argue that the jury should have been instructed regarding the definition of perjury to

5   assist them in evaluating Officer Seyffert's testimony.  Petitioner contends that "materially" is an

6   element of the crime of perjury.

7      Respondent argues that this claim is procedurally defaulted because the Superior

8   Court found it barred by the <u>Dixon</u> rule.  (<u>See</u> Respondent's Lodged Document 11, at 2.)  For the

9   reasons the court above found petitioner's claims alleging insufficient evidence procedurally

10  barred, this claim is barred as well.

11     Because this claim also has no merit, the undersigned finds that petitioner has not

12  demonstrated that the court's failure to consider this claim will  result in a fundamental

13  miscarriage of justice.

14     As noted by respondent in the answer, perjury was not a crime at issue in

15  petitioner's trial.  For that reason, the trial court was not obligated to provide the jury with such

16  an instruction.  In any event, the jury was given other instructions regarding how to evaluate the

17  testimony of witnesses.  Accordingly, this claim is without merit.

18     *Lesser Offenses*

19     Petitioner alleges that the trial court erred by denying trial counsel's request for

20  instructions regarding the lesser included offense of attempted voluntary manslaughter and

21  assault with a deadly weapon.  Respondent argues that this claim is procedurally defaulted

22  because the Superior Court found it barred by the <u>Dixon</u> rule.  (<u>See</u> Respondent's Lodged

23  Document 11, at 2.)  For the reasons the court herein found petitioner's claims alleging

24  insufficient evidence procedurally barred, this claim is barred as well.

25     Because this claim also has no merit, the undersigned finds that petitioner has not

26  demonstrated that the court's failure to consider this claim will  result in a fundamental

1   miscarriage of justice.

2          The trial court denied the request by petitioner's counsel for a jury instruction

3   regarding attempted voluntary manslaughter on grounds that there was no factual basis for the

4   instruction.  (RT at 646.)  It does not appear that petitioner's counsel requested an instruction

5   regarding assault with a deadly weapon.

6          A criminal defendant is entitled to adequate instructions on the defense theory of

7   the case. See Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's

8   request for instruction on simple kidnaping where such instruction was supported by the

9   evidence).  However, the defendant is not entitled to an instruction embodying the defense theory

10  if the evidence does not support it.  Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

11         No evidence was presented in support of an instruction for attempted voluntary

12  manslaughter.  Attempted voluntary manslaughter, like attempted murder, requires proof of the

13  intent to kill.  People v. Montes, 112 Cal.App.4th 1543, 1546-52 (2003).  Unlike attempted

14  murder, however, it does not require proof of malice.  Id. at 1548.  The element of malice is

15  presumptively negated by a sudden quarrel or heat of passion, or when a defendant attempts to

16  kill in an "'unreasonable, but good faith, belief that deadly force is necessary in self-defense.'"

17  People v. Manriquez, 37 Cal.4th 547, 583 (2005) (internal citations omitted.)  No evidence was

18  presented that petitioner fired the shots in the heat of passion or that he fired in self-defense.  In

19  fact, petitioner's defense seemed to be that he did not fire a gun at all.

20         Assuming petitioner's counsel requested an instruction for assault with a deadly

21  weapon, the evidence did not support such an instruction.  The crime of attempted murder

22  requires "a specific intent to kill a human being – an intent which can never be replaced by

23  implied malice." People v. Coleman, 48 Cal.3d 112, 142 (1989).  Assault with a deadly weapon,

24  in contrast, is a general intent crime; it does not require a specific intent to injure.  People v.

25  Colantuono, 7 Cal.4th 206, 213-14 (1994).  The evidence presented at petitioner's trial

26  demonstrates that he intended to injure his victims when he shot at them.  For this reason, and

1   because petitioner's defense seemed to be that he did not fire a gun at all, the trial court would

2   not have erred in denying counsel's request for an instruction for assault with a deadly weapon.

3          Assuming counsel did not request an instruction for assault with a deadly weapon,

4   assault with a deadly weapon is a lesser related offense of attempted murder.  See People v.

5   Nelson, 51 Cal.4th 198, 215 (2011) (assault with a deadly weapon is a lesser related offense of

6   attempted murder).  The failure of a state trial court to sua sponte instruct on lesser-related

7   offenses does not present a federal constitutional claim on which federal habeas relief may be

8   afforded.  See Hopkins v. Reeves, 524 U.S. 88, 90-91 (1998).

9          For the reasons discussed above, the undersigned finds that petitioner's claim

10   challenging the trial court's failure to give instructions regarding the lesser related and lesser

11   included offenses is without merit.

12             *Gang Enhancement Instructions*

13          Petitioner argues that the trial court failed to instruct the jury that to find petitioner

14   guilty of the gang enhancement, it had to find that he actively participated in a street gang.  As

15   discussed above, California Penal Code section 186.22(b) does not require active gang

16   participation.  In re Ramon T., 57 Cal.App.4th at 207.  Accordingly, this claim is without merit.

17           D.  Alleged Violation of Right to Confront Witnesses

18          Petitioner alleges that the trial court violated his right to confront witnesses (Dkt.

19   1, at 127, 130-34, 143-49).  In particular, petitioner argues that the gang expert's reliance on

20   hearsay as a basis for his expert opinion that petitioner was a member of the Nogales Gangster

21   Crips violated his right to confront and cross-examine witnesses.  Petitioner cites pages 532-33

22   of the reporter's transcript wherein Adlert Robinson testified, in relevant part, that in 1993

23   Kenyatta Hudson was interviewed by Detective Lopez.  (RT at 532.)  During the interview,

24   Hudson stated that he (Hudson) was a member of the Nogales Gangster Crips and that petitioner

25   was also a member.  (Id. at 532-33.)

26          The Confrontation Clause of the Sixth Amendment guarantees a criminal

1  defendant the right to confront and cross-examine witnesses.  <u>Pennsylvania v. Ritchie</u>, 480 U.S.

2  39, 51 (1987).   As a result, testimonial statements of a witness who does not appear at trial may

3  not be admitted into evidence unless the witness is unavailable and the defendant had a prior

4  opportunity to cross-examine him.  <u>Crawford v. Washington</u>, 541 U.S. 36, 68 (2004). To prevail

5  on a Confrontation Clause claim, however, a petitioner must also show that the testimony

6  resulted in prejudice.  <u>Slovik v. Yates</u>, 556 F.3d 747, 755 (9th Cir. 2009).

7           Assuming the at-issue testimony violated the Confrontation Clause, petitioner was

8  not prejudiced because there was other evidence of petitioner's gang membership.  In particular,

9  Robinson also testified that petitioner was a self-admitted gang member:

10          Q: He's [petitioner] been contacted by law enforcement, and said
             that he is a Nogales Gangster Crip in the past, correct?
11
             A: That's correct.
12
             Q: Okay.  And this is as early as 1991?
13
             A: That's correct.
14
             Q: That's when the Sacramento Probation Department identified
15            him as a Nogales Crip associate?

16           A: That's right.

17  (RT at 532.)

18           Robinson also testified that petitioner had been validated by the California

19  Statewide Law Enforcement Agency as a Nogales Crip.  (<u>Id.</u> at 533.)  Robinson also testified that

20  petitioner had Nogales Gangster Crip related tattoos based on photographs of the tattoos that

21  were shown to the jury.  (<u>Id.</u> at 533-34.)  Because there was other evidence that petitioner was a

22  member of the Nogales Gangster Crips, petitioner was not prejudiced by Robinson's testimony

23  that Hudson had previously told Detective Lopez that petitioner was a gang member.[3]

24

25          [3]  The undersigned also observes that several courts examining the instant issue have
    found that a gang expert's reliance on hearsay does not violate the Confrontation Clause.  <u>See</u>
26  <u>Lopez v. Jacquez</u>, 2010 WL 2650695 at * 5 (E.D. Cal. 2010) (gang expert's reliance on hearsay

1    Petitioner also argues that the prosecutor improperly allowed Robinson to testify

2   to an "ultimate issue" of the case.  (Dkt. No. 1, at 143-49.)  In particular, petitioner contends that

3   Robinson was improperly allowed to testify that "the word on the street" was that the Elm Street

4   Bloods were responsible for Little Rah Rah's murder.  Petitioner argues that Robinson offered no

5   other facts to support this opinion.  The undersigned construes this as another claim alleging

6   violation of the Confrontation Clause.

7    As stated above, the Confrontation Clause bars only testimonial statements made

8   by an unexaminable witness.  Crawford, 541 U.S. at 50.  Testimonial statements are those "made

9   under circumstances which would lead an objective witness reasonably to believe that the

10   statement would be available for use at a later trial."  Parle v. Runnels, 387 F.3d 1030, 1037 (9th

11   Cir. 2004); see Crawford, 541 U.S. at 51 ("[A] formal statement to government officers [is]

12   testimony in a sense that ... a casual remark to an acquaintance [is] not.")

13    The "word on the street" is not testimonial in nature.  Although somewhat vague,

14   "word on the street" reasonably suggests casual remarks made by people living in the

15   neighborhoods considered to be the turf of the Elm Street Bloods and Nogales Street Crips to

16   each other or even law enforcement, which are not statements that they reasonably would believe

17   would be later used at a trial.  Accordingly, this testimony did not violate the Confrontation

18   Clause.

19    E.  Alleged Prosecutorial Misconduct

20    *Legal Standard*

21

22   testimony to explain his opinion that the petitioner was a gang member did not violate the
petitioner's Confrontation Clause rights because Federal Rules of Evidence 703 permits experts

23   to rely on inadmissible hearsay evidence as long as the evidence is of the kind experts in the field
regularly consult); Walker v. Clark, 2010 WL 1643580, at * 15 (C.D. Cal. 2010) (the gang expert

24   "could properly base his opinion on inadmissible evidence, including hearsay, of a kind that
experts in the field regularly consult"); but see United States v. Mejia, 545 F.3d 179, 197 (2d Cir.

25   2008) (noting police experts are not allowed to simply transmit otherwise inadmissible hearsay
under the guise of expert witness testimony).

26

1        On habeas corpus review, the narrow standard of due process applies to claims of

2  prosecutorial misconduct.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A prosecutor's

3  error or misconduct does not, per se, violate a criminal defendant's constitutional rights.  See

4  Jeffries v. Blodgett, 5 F.3d 1180, 1191 (1993) (citing Darden, 477 U.S. at 181; Campbell v.

5  Kincheloe, 829 F.2d 1453, 1457 (9th Cir. 1987)).  A defendant's due process rights are violated

6  only if the error or misconduct renders the trial fundamentally unfair.  Darden, 477 U.S. at 181.

7        The question to be resolved is whether the alleged misconduct "'so infected the

8  trial with unfairness as to make the resulting conviction a denial of due process.'"  Hall v.

9  Whitley, 935 F.2d 164, 165 (9th Cir. 1991) (quoting Donnelly v. DeChritoforo, 416 U.S. 637,

10  643 (1974)).  In order to determine whether prosecutorial misconduct occurred, it is necessary to

11  examine the entire proceedings and place the prosecutor's conduct in context.  Greer v. Miller,

12  483 U.S. 756, 765–66 (1987).  Factors to be considered in determining whether habeas corpus

13  relief is warranted include whether the prosecutor manipulated or misstated the evidence;

14  whether his comments implicated other specific rights of the accused; whether the objectionable

15  content was invited or provoked by defense counsel's argument; whether the trial court

16  admonished the jurors; and the weight of the evidence against the defendant.  Darden, 477 U.S.

17  at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).)  Relief is limited to cases

18  in which a petitioner can establish that the misconduct resulted in actual prejudice.  Johnson v.

19  Sublett, 63 F.3d 926, 930 (1995) (citing Brecht v. Abrahamson, 507 U.S. 619, 637–38 (1993)).

20  In other words, prosecutorial misconduct violates due process when it has a substantial and

21  injurious effect or influence in determining the jury's verdict.  Ortiz–Sandoval v. Gomez, 81 F.3d

22  891, 899 (9th Cir. 1996)

23        In considering claims of prosecutorial misconduct involving allegations of

24  improper argument, the court is to examine the likely effect of the statements in the context in

25  which they were made and determine whether the comments so infected the trial with unfairness

26  as to make the resulting conviction a denial of due process.  Turner v. Calderon, 281 F.3d 851,

868 (9th Cir. 2002); Sandoval v. Calderon, 241 F.3d 765, 778 (9th Cir. 2001).  In fashioning

closing arguments, prosecutors are allowed "reasonably wide latitude,"  United States v. Birges,

723 F.2d 666, 671–72 (9th Cir. 1984), and are free to argue "reasonable inferences from the

evidence." United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989).  See also Ducket v.

Godinez, 67 F.3d 734, 742 (9th Cir. 1995).  "[Prosecutors] may strike 'hard blows,' based upon

testimony and its inferences, although they may not, of course, employ argument which could be

fairly characterized as foul or unfair."  United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir.

1972).

> *Analysis*

Petitioner raises claims of prosecutorial misconduct in three sections of his

petition.[4]  First, petitioner alleges that the prosecutor committed misconduct by "soliciting gang

expert opinion hearsay testimony on an ultimate issue of the case." (Dkt. 1 at 143.)  In this

claim, petitioner challenges gang expert Robinson's testimony that "the word on the street" was

that the Elm Street Bloods killed Baby Rah Rah.  The undersigned has construed the briefing in

this section as raising a Confrontation Clause claim as well as further argument in support of the

claim that there was insufficient evidence to support the gang enhancement.  Petitioner's briefing

in this section of the petition does not raise a prosecutorial misconduct claim.  Accordingly, this

section of the petition will not be further discussed.

Petitioner alleges that the prosecutor committed misconduct during closing

argument by becoming an unsworn witness (id. at 154-59), and by mischaracterizing evidence

and failing to properly instruct the jury (id. at 159-68).

The undersigned will first address petitioner's claim that the prosecutor became

an unsworn witness.  The background to this claim is accurately summarized in respondent's

---

[4]  Respondent, not unreasonably, construed the petition only to raise ineffective assistance of counsel claims based on trial counsel's failure to object to the alleged prosecutorial misconduct.  In an abundance of caution, the undersigned has construed the petition to raise both ineffective assistance and prosecutorial misconduct claims.

answer.  Accordingly, it is adopted below, with minor changes.

During the August 11, 2005, preliminary hearing for this matter, Washington, King and Bradford all testified as prosecution witnesses.  (CT at 471-537.)  It was apparent from their testimony that all three knew Brandon Boyer, a validated member of the Elm Street Bloods.  (Id. at 530-31.)  For instance, Washington testified that Bradford's car was parked across Elm Street on a prosecution diagram.  (Id. at 520-23.)  He also testified that the area of Elm Street near Boyer's house was known in the community as a Blood gang area.  (Id. at 522.)  King testified that Boyer lived near the corner of Elm Street and Grand Avenue and that he and Bradford had been parked across the street from Boyer's house on the night of the shooting.  (Id. at 504-06.)  Bradford indicated that he and some friends, including Boyer, had planned on going to the casino in Jackson that night.  (Id. at 472.)

However, when Washington, King and Bradford testified at trial on January 8, 2007, none of them could remember knowing Boyer.  For example, Washington testified that he did not know who lived at 3813 Elm Street and stated, "Uh, I don't know a Boyer.  I don't know no Brandon Boyer by the last name."  (RT at 91-92.)  Washington also denied knowing whether Elm Street was a Blood or a Crip gang area.  (Id. at 92-93.)  King and Bradford also denied knowing Boyer or knowing where Boyer lived.  (Id. at 125-26, 148.)

In response, the prosecution asked both Washington and King if being a "snitch" was a good or bad thing.  (Id. at 93, 128-30.)

Q: Do you think your memory was better than it is now about this?

A: Hm, no.  It's – you know, it's all – it's not – I mean, about this, about the case, about, you know, about my statement and all that.  I – I don't remember, you know, what I said exactly or, you know, none of that.

Q: Well, let me ask you this: Do you know what a snitch is?

A: Yeah.  I guess.

Q: What's that?

1        A: It's somebody that tell on somebody.

2        Q: Is that a good thing or a bad thing to you?

3        A: That's – that's people's choice, whatever they want to do.  I'm
4        not going to judge on that.  I don't judge what other, you know –

5  (Id. at 92-93.)

6        Q: Do you remember telling Officer Marquez that you saw a dark
7        Chevy with a white top?

8        A: I didn't say no dark Chevy with no white top.  I don't remember
        saying that.

9        Q: You don't remember seeing it?

10       A: I probably remember a dark car, but I didn't say no Chevy with
11       a white top.

12       Q: Do you know what a snitch is?

13       A: Do I know what a snitch is?

14       Q: Yes.

15       A: Yeah.

16       Q: What is a snitch?  Tell us.

17       A: Someone who tells on somebody.

18       Q: Is that a good or a bad thing?

19       A: It depends.

20       Q: Well, would it be a bad thing to do that in court?

21       A: It depends.

22       Q: Would it be a good or bad thing to snitch to a police officer?

23       A: It depends.

24       Q: How about in your situation?

25       A: What is my situation?

26       Q: Well, you heard these shots fired, right?  Right?

1  A: Yep.

2  Q: You talked to a police officer, right?

3  A: Yep.

4  Q: Is it good or bad for you to come to court today in your mind?

5  A: In my mind?

6  Q: Yeah.

7  A: It depends.

8  Q: What does it depend on?

9  A: What do these questions got to do with –

10  Court: Answer the question, sir.

11  A: I don't – what was the question?

12  Q: Is it good or bad for you to be in court today in your own mind?

13  A: It's bad.  It's good.  I mean, I'm trying to help somebody out.

14 (Id. at 129-30.)

15  During closing argument, the prosecutor made the following at-issue remarks:

16  Have we shown also – This is one of the elements in this allegation
  – that there's a pattern of criminal activity?  Absolutely.  It's those
17  two different offenses.  And as I mentioned and touched on, what it
  does is it tells you what's going on with Ivory King.  How come he
18  copped the attitude that he did?  What was that about?  He doesn't
  know who did this, and yet he comes into court and acts the way
19  that he did.  Same with the other two guys to different extents.

20  This – these kinds of cases are completely different from other
  cases.  You know, we get bank robberies in this building.  They're
21  not done by gang members some of them.  And the ones that are
  not – and we have bank tellers and we have bank customers who
22  they'll come to court without a subpoena.  They'll come in here
  and say, yes, that is what happened.  I was robbed.  I got scared.
23
  They may or may not be able to identify the person who did it. And
24  they'll tell us.  And it's clear that they're doing the best that they
  can to help everybody out in simply getting whatever information
25  that's in their head out into evidence from the witness stand.

26  Not gang cases.  The moment the police show up it's a completely

different world.  And when it hits the Court system and finally we get a jury picked and finally we get these people to court, this is what we get.  Doesn't matter.  Doesn't mean these crimes didn't happen.

But without understanding truly what they're dealing with and what kind of a world has been created by the Nogales Crips gang members in this case, it's really impossible to put any sort of rational understanding on the way they would act.

The prevailing thought we're not going to snitch.  We're going to take care of our own business.  We're not going to come to court.  And if they make us come to court, just gonna say I don't remember or I don't recall or I didn't know.

(Id. at 680-81.)

The California Court of Appeal found no prosecutorial misconduct for the reasons stated herein:

Defendants contend that the prosecutor's questioning of witnesses and statements in closing argument amounted to unsworn testimony and was therefore improper. They assert that the failure of their attorneys to object to these remarks constituted ineffective assistance of counsel. There was no misconduct.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, ... when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (People v. Morales (2001) 25 Cal.4th 34, 44.)

The questions posed to the witnesses did not involve any unfairness or deceptive practices. The prosecutor was entitled to ask the witnesses about their change of testimony, and these questions were well within the proper scope of that inquiry.

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (People v. Morales, supra, 25 Cal.4th at p. 44.) However, a prosecutor may not refer to facts not in evidence and suggest facts exist that are unsupported by the record. (People v.

45

<u>Hill</u> (1998) 17 Cal.4th 800, 827-828.)

> The prosecutor's comments to the jury were appropriate remarks given the gang expert's testimony, the victims' inconsistent testimony, and the victims' behavior in court. Contrary to defendants' claims, the prosecutor's statements did not constitute unsworn testimony. They were simply comments on the evidence and focused on the appropriate inferences that could be drawn. There is no likelihood that the jury misconstrued the prosecutor's comments in any improper manner. (See <u>People v. Clair</u> (1992) 2 Cal.4th 629, 663; <u>People v. Adanandus</u> (2007) 157 Cal.App.4th 496, 513-514.)

(Respondent's Lodged Document 6 at 14-15.)

For the reasons stated by the California Court of Appeal, the undersigned finds that the prosecutor's questions to the witnesses regarding snitching and the closing argument suggesting that these witnesses were reluctant to testify because they did not want to be snitches did not constitute misconduct. The prosecutor was allowed to ask the witnesses why they changed their testimony. As noted by the state appellate court, the prosecutor's argument regarding the reluctance of the victims to testify regarding what happened and their changed testimony was not inappropriate as it was based on reasonable inferences from the evidence. Accordingly, this claim should be denied.

Petitioner next argues that the prosecutor committed misconduct during closing argument by asserting that petitioner was one of the suspects who fired shots. During closing argument, the prosecutor commented, in relevant part,

> What does this mean in the context of this case? Look, I'm going to tell you there were at least two, these two people in that Chevy Caprice when those guns were fired. There possibly was another person. Do we suspect we know who it was? Yeah, we do.
>
> What this means is that you don't have to determine who shot which gun, you don't have to determine who fired the bullet that actually hit Dellanthony Bradford, who fired the bullet that actually hit that silver or champagne Oldsmobile, you just have to determine whether the guys in that car by their actions were helping out the other guys in that car.
>
> You don't have to determine who was the driver. As long as each

1   one of these Defendants was either a shooter or an aider or abettor,
    they're equally guilty.  One exception to this there's two different
2   kinds of gun allegations.  I'll get to that in a little bit.  But that's the
    only difference, the only exception, to this concept of aiding and
3   abetting.

4   Because, you know what, *as we sit here right now, nobody can tell*
    *you which gun Roger Adams fired.*  Was it the .38?  Was it the .22?
5   Or was it the .40?  Nobody can tell you which gun Andy Trotter
    fired.  Was it the .38?  Was it the .22?  Or was it the .40?  Or did
6   one of them fire more than one of the guns?

7   (RT at 664-65.)

8           In analyzing the related ineffective assistance of counsel issue raised in his habeas

9   corpus petition, the Superior Court found that the at-issue closing argument did not constitute

10  prosecutorial misconduct for the reasons stated herein:

11

12          According to petitioner, the prosecutor asserted that petitioner was
            one of two suspects who fired shots from a Chevy Caprice, and
13          defense counsel interposed no objection even though no evidence
            supported that assertion.  Petitioner admits, however, that there
14          was evidence at trial that he (1) was in the vicinity of the shooting
            just after the shooting, (2) had material on his hands that "could
15          be" gun-shot residue, and (3) discarded a sock, while detained in a
            police car following the shooting, containing two live rounds of
16          ammunition that matched a discharged casing found at the crime
            scene.  The petitioner does not allege that the prosecutor did
17          anything other than summarize the evidence for the jury, which is
            not improper regardless of whether petitioner believes that
18          evidence was sufficient to support the verdict.  As the petitioner
            does not allege, let alone show, that the prosecutor committed
19          misconduct in summarizing the evidence, petitioner has failed to
            state a prima facie case that defense counsel's decision not to
20          object to that summary amounted to deficient performance.  This
            court therefore denies petitioner's claim that trial counsel rendered
21          ineffective assistance for the additional reason that petitioner had
            not made a prima facie showing in support of the claim.

22  (Respondent's Lodged Document 11 at 3-4.)

23          For the reasons stated by the Superior Court, the undersigned finds that the

24  prosecutor did not commit misconduct by arguing that no one could tell which gun petitioner

25  fired.  It was reasonable to infer from the evidence, which the prosecutor was entitled to do, that

26  petitioner shot one of the guns.  Accordingly, this claim of prosecutorial misconduct is without

                                            47

1   merit.

2   F.  Alleged Ineffective Assistance of Counsel

3   *Legal Standard*

4   The test for demonstrating ineffective assistance of counsel is set forth in

5   Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

6   all the circumstances, counsel's performance fell below an objective standard of reasonableness.

7   Strickland, 466 U.S. at 688.  To this end, the petitioner must identify the acts or omissions that

8   are alleged not to have been the result of reasonable professional judgment.  Id. at 690.  The

9   federal court must then determine whether in light of all the circumstances, the identified acts or

10  omissions were outside the wide range of professional competent assistance.  Id.  "We strongly

11  presume that counsel's conduct was within the wide range of reasonable assistance, and that he

12  exercised acceptable professional judgment in all significant decisions made."  Hughes v. Borg,

13  898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689).

14  Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

15  693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

16  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

17  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

18  In extraordinary cases, ineffective assistance of counsel claims are evaluated

19  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93 (2000)

20  (citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

21  The Supreme Court has emphasized the importance of giving deference

22  to trial counsel's decisions, especially in the AEDPA context:

23  > To establish deficient performance, a person challenging a
    > conviction must show that 'counsel's representation fell below an
24  > objective standard of reasonableness.' [Strickland, supra,] 466 U.S.
    > at 688, 104 S.Ct. 2052.  A court considering a claim of ineffective
25  > assistance must apply a 'strong presumption' that counsel's
    > representation was within the 'wide range' of reasonable
26  > professional assistance.  Id., at 689, 104 S.Ct. 2052.  The

challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' Id., at 687, 104 S.Ct. 2052.

With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694, 104 S.Ct. 2052.  It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Id., at 693, 104 S.Ct. 2052.  Counsel's errors must be 'so serious' as to deprive the defendant of a fair trial, a trial whose result is reliable.' Id., at 687, 104 S.Ct. 2052.

'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010).  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690, 104 S.Ct. 2052.  Even under de novo review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689, 104 S.Ct. 2052; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838 (1993).  The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.  Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S., at ----, 129 S.Ct. at 1420.  The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

1   Harrington v. Richter, 131 S.Ct. 770, 787-88 (U.S. 2011); see also Premo v. Moore, 131 S. Ct.

2   733 (U.S. 2011) (discussing AEDPA review of ineffective assistance of counsel claim where

3   petitioner alleges that counsel was ineffective at the plea bargain stage).

4                    *Analysis*

5                    Petitioner first argues that his trial counsel provided inadequate assistance by

6   failing to object and request admonitions when the prosecutor committed misconduct during

7   opening and closing arguments.  (Dkt. 1, at 136-41.)  Petitioner cites no specific instance of

8   alleged ineffective assistance of counsel in support of this claim but instead makes the following

9   conclusory argument:

10          Here, defense counsel provided constitutionally ineffective
            assistance by failing to make timely objections of prosecutorial
11          misconduct and to preserve the issue for appeal, failure to present
            favorable evidence for the defendant, failure to object to the
12          prosecutor becoming an unsworn witness by interjecting his own
            assertions of the way the witnesses should have testified and that
13          they frieghed [sic] their testimony, failure to object to the
            prosecutions rude and intempered [sic] behavior that caused a
14          pattern of undue prejudice to the defendant, failure to request
            admonition from the court following prosecutorial misconduct
15          under state law only if it involves the use of deceptive or
            reprehensible methods to attempt to persuade either the trial court
16          or the jury.

17   (Dkt. 1 at 139.)

18                   Petitioner appears to base his ineffective assistance of counsel claims on the

19   alleged prosecutorial misconduct discussed above.  The California Court of Appeal found that

20   counsel was not ineffective for failing to object to the prosecutor's questions to the witnesses

21   regarding "snitching" and the related closing argument:  "Because there was no [prosecutorial]

22   misconduct, defendants' attorneys had no reason to object, and defendants' claims of ineffective

23   assistance of counsel necessarily fail."  (Respondents' Lodged Document 6, at 16.)

24                   The undersigned above found no misconduct regarding the "snitching" questions

25   and related closing argument.  For this reason, the undersigned agrees with the California Court

26   of Appeal that any objection to these questions or argument by counsel would have failed.

1   Accordingly, this claim of ineffective assistance of counsel is without merit.

2         As discussed above, the Superior Court rejected petitioner's claim that counsel

3   was ineffective for failing to object to the prosecutor's remark in closing argument that petitioner

4   was one of the shooters.  The undersigned agrees with the reasoning of the Superior Court and

5   finds that this claim is without merit.

6   V.  Conclusion

7         In his reply to the answer, petitioner requests an evidentiary hearing.  Petitioner

8   has not demonstrated that he is entitled to an evidentiary hearing as to any claim.  See Cullen v.

9   Pinholster, 131 U.S. 1388 (2011).

10        For all of the above reasons, IT IS HEREBY RECOMMENDED that petitioner's

11  application for a writ of habeas corpus be denied.

12        These findings and recommendations are submitted to the United States District

13  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

14  one days after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files

17  objections, he shall also address whether a certificate of appealability should issue and, if so, why

18  and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if

19  the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

20  2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

21  service of the objections.  The parties are advised that failure to file objections within the

22  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

23  F.2d 1153 (9th Cir. 1991).

24  DATED:  August 10, 2011

25                          KENDALL J. NEWMAN
                           UNITED STATES MAGISTRATE JUDGE

26  ad2266.157